Caldwell v. Hennen.

## ALEXANDER CALDWELL v. DUNCAN N. HENNEN.

Where one claims, as the heir of his mother, against a third person in possession, pro-
perty which belonged to the community of *acquêts* existing between his parents, he
must show that his father had such a title, at the dissolution of the community, as
would have enabled him, in his own right and as tutor of his son, to maintain a
petitory action for the property; for if any contracts or engagements were entered
into by the father, during the existence of the community, which were binding on
him, showing that his apparent title was not a real one, whether evidenced by pri-
vate writings shown to exist, and proved by extrinsic evidence to have a real date,
or by authentic acts, they must have been binding on the community, and descend-
ed to the heir of the wife as a necessary burden upon his inheritance, estopping
him from disturbing a title derived from the community.

othing in the laws of this State prohibits a party from holding in his own name
lands belonging to another, subject to the order of the latter. Such an arrange-
ment has no analogy to the *fidei-commissa* abolished by the Civil Code. By the
latter, the trustee is bound to retain for, and deliver to a third person, the thing
confided to him, which is placed beyond the control of the person creating the
trust.

Neither the wife, nor her heirs, are third persons as to the husband, in relation to acts
done by him as the head of the community. Domestic papers admissible against
the husband, are so against the wife, or her heirs.

APPEAL from the District Court of the First District, *Bucha-
nan*, J.

*Preston* and *A. Hennen*, for the plaintiff.

*Eustis* and *Grymes*, for the appellant.

BULLARD, J. This is an action of slander of title. The plain-
tiff alleges that he is the owner and possessor of two city lots, at
the corner of Dauphine and Canal streets, but that Duncan N.
Hennen holds out to the public, that he has a just title to one un-
divided half of said lots, but refuses to bring suit to make good his
pretended title.

The defendant, Duncan N. Hennen, by his answer in recon-
vention, asserts title to one undivided half of the lots in question,
as the heir of his mother; averring, that the two lots belonged to
the community of *acquêts* and gains, formerly existing between
his mother, whose succession he has accepted, and his father,
Alfred Hennen, by purchase at a sheriff's sale, about the 27th of
July, 1813. That his mother departed this life in May, 1818,
leaving the defendant her sole heir, then a minor; that his father

continued to administer his property as natural tutor; that his title to said property has never been legally impaired or divested, either before or since he attained the age of majority; and that, if any pretended alienations or transfers have at any time been made of said property, so as to affect the respondent's title thereto, the same were collusive and fraudulent.

The defendant, therefore, stands before the court as if he were plaintiff in a direct petitory action, and must make good his title. In order to do so, he must show that the two lots belonged to the community, in May, 1818; and that no valid alienation has since been made of them. Claiming, as he does, under the community, and under his father, as the head of that community, he must show that his father had such a title at the dissolution of the community, as would have enabled him, in his own right, and as tutor of his son, to maintain a petitory action for the lots against Paulding, who appears to have been then in possession, and from whom the plaintiff, Caldwell, derives his title. We concur with the counsel for the plaintiff, that this is the true question which the case presents; and that the plaintiff in reconvention must show that his father had, at the moment the community was dissolved, a title valid against Paulding; for, if any contracts or engagements were entered into by him during the existence of the community, which were binding upon him, showing that his apparent title was not a real one, but that he was bound to convey to Paulding, in fulfilment of a contract with Hunter, such an agreement, whether evidenced by private writings, shown to exist, and to have had a real date, by extrinsic evidence, or by authentic act, was binding on the community, descended to the heir of the wife as a necessary burden upon his inheritance, and he will be estopped by it from disturbing a title derived from the community. A contrary doctrine would, in our opinion, lead to the most revolting consequences. It would make it the interest of the wife to act the constant spy upon the daily transactions of her husband. It would compel him to act as if surrounded by enemies, or, at least, by strangers; and it would make it the interest of his children to enrich themselves at the expense of their father's honor and good faith.

This view of the case leads us to examine the evidence, touch-

ing the title of the original plaintiff, beginning with the act of sale of 1828, after the dissolution of the community; in order to ascertain, whether there existed previously, and during the community, such a title in Paulding, by effect of his agreements with Hunter and Alfred Hennen, the last warrantor, as to make that act rather the consummation, or the discharge of a pre-existent contract, than *per se* the sale of the premises. That act declares, that Alfred Hennen has sold and conveyed to C. Paulding, the two lots, *without any warranty whatever, but his own acts,* the latter acknowledging himself in possession, for the sum and price of $2673 31, cash, and the vendee assumes to pay the ground rents to the city corporation. The vendor conveys the right of recovering back-rents from those who may have occupied the premises as tenants. The deed recites, that the lots belonged originally to the city, were sold on ground rent; and, that the rents not being paid, they were seized and sold at sheriff's sale in 1813, and were purchased by the vendor, A. Hennen, subject to the ground rent.

It is shown, that Paulding was already in possession, and exercised acts of ownership. He had sued a tenant for rents, and in his petition, of which a copy is in the record, he alleged his ownership. It is true, he failed in his suit in the District Court, not having adduced satisfactory evidence of title. But the judgment was reversed in this court, because he showed possession since 1819.

In order to show how the title stood during the existence of the community, a document was introduced, signed by George Hunter, and bearing date the 17th of January, 1818, in the following words: " I have sold, for a valuable consideration, unto Cornelius Paulding, the two lots Nos. 27 and 28, lately belonging to Alexander's estate, bought by him, the said Alexander, of the corporation, and I request Mr. A. Hennen, in whose name the sale now stands, to pass the title to Mr. Paulding."

This document is in the handwriting of A. Hennen, and is shown, by incontestible evidence, to have been written at the time it bears date—at a time not suspicious, during the existence of the community, and in the absence of any possible motive to defraud any body, and, least of all, his own wife. Hunter is shown to

have been the owner of the adjacent lots, and to have made some improvements, and exercised acts of ownership. The ownership of the property was at that time considered as onerous, on account of the heavy ground rent due to the corporation, and no one appeared desirous of being known to the public as the owner.

Another document of a still earlier date, also in the handwriting of A. Hennen, was read in evidence. It is endorsed : " Geo. Hunter's papers.—Alfred Hennen's acc$^t$ of cash paid by Geo. Simpson and others—ground rent on the Canal lots." " Geo. Hunter's paper, relative to money, p$^d$ on Canal lots." These endorsements arc in the handwriting of a member of Dr. Hunter's family, and of an agent of his son. The document was, without any doubt, in the possession of Hunter. It appears to be a memorandum of moneys received. After stating certain sums paid by Simpson, for ground rent on the two lots, he puts down : " Note of J. Poulteney, Jr. for $605 45, paid for the two lots, originally bought of the corporation by Alexander, and sold to A. Hunter, for account of Dr. Hunter." " 28th July, 1813, two lots, sold Dr. Hunter, for $810, subject to an annual ground rent of $330, from July 28, 1813."

Here is an admission, in the handwriting of A. Hennen, made also, at a time not suspicious, shown by extrinsic evidence to have a true date, that the two lots formerly the property of Alexander, belonged to Dr. Hunter, by a private agreement with him, although nominally the property of A. Hennen. The price is stated, to wit, $810, and the ground rents at the rate of $330, from the 28th July, 1813, the very day they appear to have been sold at the sheriff's sale.

Let us pause here, and inquire—whether Hennen, after writing himself these recognitions of the title of Hunter, and the order of Hunter to himself to convey to Paulding, and after Paulding had gone into possession, under his agreement with Hunter ; after signing the petition of Paulding, as his attorney in the suit against Dowell for rent, in which the ownership of the plaintiff is distinctly alleged—could have been permitted to set up a title adverse to Paulding, and to have recovered the lots from him. Those private writings are binding on him. They contain unequivocal admissions, that he had no real title to the lots ; that he was acting

as the confidential agent, or trustee of Hunter, with full notice that Hunter had transferred his rights to Paulding. When sued himself for the ground rents due to the city, he disclaimed title. With all this evidence against him, Hennen would have been re-pelled in any attempt to disturb the title of Paulding. It would have been dishonest to claim it. We cannot, therefore, but re-gard the act of sale, in 1828, to Paulding, as the mere perform-ance of engagements already existing ; as merely intended to fur-nish Paulding with authentic evidence of title : and this view of the case is strengthened by the consideration, that the price was within a few cents the exact amount which Hennen had been ad-judged to pay, as the apparent owner of the lots, for back-rents due to the corporation.

These private writings, marked C and E, were not read to the jury without the most formal opposition, and the grounds of that opposition are set forth in a bill of exceptions in the record. That bill of exceptions presents most of the questions involved in this controversy. The first objection was, that these instru-ments contradict the authentic act passed between A. Hennen and Paulding, on the 19th of May, 1828. That act purported to convey, only such right and title as Hennen might have, and that without warranty ; and is not, in our opinion, contradicted by evidence tending to show that the conveyance was made, in point of fact, in the performance and discharge of pre-existent agreements.

The second objection was, that under the answer of A. Hen-nen, these instruments went to establish a *trust* in behalf of George Hunter—an estate or interest not authorized by the laws of Louisiana. If by this was meant, that the *fidei com-missa* abolished by the code, have any analogy to the confi-dential understanding between Hennen and Hunter, we think it a mistake. The *fidei commissum* prohibited by the code, is a species of substitution. The trustee is bound to retain for, and deliver to, a third person, the thing confided to him, which is placed beyond the control of the person making the trust. The relation between Hunter and Hennen was rather that of principal and agent, before the former directed a conveyance to Paulding ; and after that, he became the agent of Paulding. It

was an agency not contrary to good morals, unless injurious in its effects to third persons. It was obligatory upon Hennen. Both the parties to that contract placed their confidence in him, and *turpe est fidem fallere*. Most of the great operations of commerce are carried on by factors, who rarely disclose to those with whom they deal the names of their principals.

The third objection is, that the documents were domestic papers, and not admissible as evidence in favor of the parties offering them. This was precisely the reason why those documents were admissible by the party claiming under Alfred Hennen, the head of the community. They were domestic papers, and could not be gainsaid either by him, or his wife. It would be monstrous to pretend that the wife, or her heir, is a third person, as to the husband in a technical sense, in the face of that admitted principle, that she can contest no acts done by him as head of the community, until after the dissolution of the marriage, and then only on the express ground of fraud. Civil Code, art. 2373. 9 La. 452. The 4th, 5th, and 6th objections are equally untenable. One of the documents is at once evidence of a right in Paulding, and not merely a commencement of proof in writing; and, whatever may be its form, is binding on Hennen, and did not require to be recorded in order to give it effect as to himself, and those claiming under him as the head of the family. Under these circumstances, we repeat, it would have been fraudulent and dishonest in Hennen, to have refused to comply with the request contained in the paper signed by Hunter, and, instead of conveying to Paulding, to have attempted to defeat a title created, not only with his knowledge, but through his confidential agency. No argument can be drawn from the long delay in complying with that mandate, which was not finally accomplished until 1828. In the meantime Hennen remained exposed to the imputation of being the owner, and to the danger of being compelled to pay the ground rents; but the city corporation alone had a right to complain of this concealment of the real person responsible for those rents.

But the plaintiff in reconvention alleges, that the act of sale of 1828, after the dissolution of the community, was fraudulent and

collusive. That charge is not only unsupported by evidence, but is contrary to the presumption of law, and the still stronger presumption arising from natural affection. What possible motive could Alfred Hennen have had, at any time, to defraud his own son; or, at an earlier period, the mother of his son? If that had been his intention, why did he, while rendering an account afterwards of his tutorship, account for a small tract of land in a remote parish of the State, and, at the same time, attempt to keep out of view two town lots, which had become valuable, in the centre of the city of New Orleans, the apparent title to which existed in the public archives, and was as accessible to the son as to the father? One of the counsel disclaimed all intention to place the cause of his client upon any such ground. We could have wished that the allegation itself had been effaced from the record; for, after the most mature consideration of this cause, we cannot bring our minds to the conclusion that those views and interpretation of the law are sound, upon which repose the pretensions of the plaintiff in reconvention. The community of *acquêts* and gains, as regulated by our code, is not fairly obnoxious to the reproach, that it leads necessarily to such results, or tolerates such a proceeding. In the best age of that republic, whose jurisprudence has descended to us, how would a son have been received by the Prætor, who should have sought to deprive a citizen of his dwelling, by alleging his father's turpitude? Even with this interpolation of the community, fruitful as it may be in frauds, leading to the disruption of families and heartless litigation, our existing laws will not tolerate such pretensions, and justify such a proceeding. "Honor thy father and thy mother," is as much a command of the municipal law, as it is a part of the Decalogue, regarded as holy by every christian people. "A child," says the code, "whatever be his age, owes honor and respect to his father and mother." This law would be without its best sanction, if a son were permitted wantonly to hold up a torch in our tribunals, in order to attract the public gaze to the alleged misconduct of the father. The law cannot be accessary to that course of conduct and proceeding, on the part of a son, which is calculated to weaken all there is of noble and elevated in family affections

and domestic ties, and to bring down the grey head with sorrow to the grave.

*Judgment affirmed.*